SIEGEL *et al.*, *Appellants*, v. QUIGLEY.

Division One, December 23, 1893.

1. **Insolvency:** FRAUDULENT CONVEYANCE: SEPARATE ESTATE. A father may settle property on his son's wife as her sole and separate estate, although the son is at the time insolvent.

2. ———: ———: ———: PARTNERSHIP. The father of a debtor being desirous to aid him, but not willing to pay his debts, sold to his son's wife $15,000 worth of machinery for $3,500 and the three entered into a partnership, the wife putting in the machinery, the father the remainder of the capital, it being agreed that the son was to manage the business for which he was to receive a salary of $150 a month and ten per cent. of the net profits and was to bear a like proportion of the losses. *Held,* that a suit to have the property declared that of the son on the ground that the arrangement was a fraudulent device to enable him to carry on a business of his own and to avoid payment of his debts could not be sustained.

*Appeal from St. Louis City Circuit Court.*—HON. L. B. VALLIANT, Judge.

AFFIRMED.

*H. M. Pollard* for appellants.

(1) The court erred in finding for the defendants. Wait on Fraudulent Conveyances, p. 411, *et seq*; *Horton v. Dewey*, 53 Wis. 413; *French v. Holmes*, 67 Me. 189; *Seitz v. Mitchell*, 94 U. S. 583; *Bartless v. Gibson*, 17

Siegel v. Quigley.

Fed. Rep. 297; *Atvow v. Simpson,* 2 N. J. Eq. 156; *Hoyt v. Turner,* 84 Ala. 528; *Buddinger v. Willard,* 67 Md. 362; *Dewitt v. Van Sickle,* 29 N. J. Eq. 215; *Wood v. Carpenter,* 101 U. S. 141; *Burgert v. Borchert,* 59 Mo. 80; *Baldwin v. Whitman,* 71 Mo. 651; *Massey v. Young,* 73 Mo. 26; *State, etc., v. Martin,* 77 Mo. 641; *Bohannon v. Coombs,* 79 Mo. 305; *Frederick v. Allgaier,* 88 Mo. 598; *Jacobs v. Smith,* 89 Mo. 673; *Jordan v. Buschmeyer,* 97 Mo. 97; *Benne v. Schnecko,* 100 Mo, 257. (2) The court erred in overruling plaintiffs' motion for a new trial.

*Dickson & Smith* for respondents.

(1) In suits to set aside fraudulent conveyances and concealments of property, the plaintiff is strictly limited to the case made by his pleadings. The proof must support the allegations made. Wait on Fraudulent Conveyances, sec. 285. (2) *First.* An action in equity will not lie in one state to affect the ownership of stock in a corporation of another state, even though the certificates be within the jurisdiction of the court. *Kendig v. Dean,* 97 U. S. 423; Cook on Stockholders, sec. 485; *Foster v. Potter,* 37 Mo. 525; *Armour Co. v. Smith,* 20 S. W. Rep. 690; *Winslow v. Fletcher,* 53 Conn. 390; *Morton v. Grafflin,* 13 Atl. Rep. 347; *Moore v. Ins. Co.* 2 Tenn. Ch. 378; *Christmas v. Biddle,* 13 Pa. St. 223. *Second.* Such action will lie in Missouri; where the foreign corporation transacts its business, keeps its stock books and exercises all its corporate franchises and functions in Missouri. *Smith v. Mining Co.,* 47 Mo. App. 409; *Farnsworth v. Railroad,* 29 Mo. 78; *City v. Ferry Co.,* 40 Mo. 586; *McNichol v. Mer. Agency,* 74 Mo. 457. (3) Plaintiffs have an adequate remedy at law, and this objection may be raised although not pleaded. *Humphreys v. Milling Co.,* 98 Mo. 542; *Railroad v.*

*Donnell*, 77 Iowa, 221; *Tufts v. Volkening*, 51 Mo. App. 7; *Foster v. Potter*, 37 Mo. 525. (4) Assuming John B. Quigley to be still a partner in Quigley & Co., his interest cannot be reached in the manner sought in the present case. Parsons on Partnership, pp. 384-390; Story on Equity Jurisprudence, sec. 678; Story on Partnership [7 Ed.], sec. 261; *Priest v. Chouteau*, 85 Mo. 406; Bates on Partnership, secs. 915, 811, 186, 785, 928, 1109, 1111; Parsons on Partnership [3 Ed.], **492, 499, 502; *Kelly v. Clancy*, 16 Mo. App. 549; *Crow v. Drace*, 61 Mo. 225; *Rapp v. Vogel*, 45 Mo. 524; *Cox v. Runnell*, 41 Iowa, 556; *Divine v. Mitchum*, 4 Ben. M. 488; *Rainey v. Nance*, 54 Ill. 29; *Donelon v. Hardy*, 57 Ind. 393; 17 Am. and Eng. Encyclopedia Law, p. 1337. (5) Though the stock of a corporation may be transferable only on its books, yet the delivery of the certificate to the purchaser, with a power of attorney signed by the vendor, passes the entire title legally and equitably as between the parties. *Carroll v. Bank*, 8 Mo. App. 249; *Moore v. Bank*, 52 Mo. 377. (6) John B. Quigley has never been, except as to creditors of the firm, a partner in Quigley & Co. *Bank v. Branch-Crookes Saw Co.*, 104 Mo. 426; *Clifton v. Howard*, 89 Mo. 192; 17 Am. and Eng. Encyclopedia Law, p. 846, 250, and cases cited; *Gill v. Ferris*, 82 Mo. 156; *State ex rel. v. Donnelly*, 9 Mo. App. 519; *Kellogg v. Farrell*, 88 Mo. 584; *McCauley v. Cleveland*, 21 Mo. 440; *State v. Finn*, 11 Mo. App. 546; Bates on Partnership, secs. 257 and 260. (7) Even though the court holds John B. to have been a partner in Quigley & Co. since its formation, yet Mrs. Quigley, having put her separate property in the firm, has always been a partner. *Dunifer v. Jecko*, 87 Mo. 282; *Kimball v. Sievers*, 22 Mo. App. 528; *Cottrell v. Spies*, 23 Mo. App. 41; *Swan v. Caffe*, 122 N. Y. 308; *In re Kinkead*, 3 Bissell, 410; *May v. May*, 8 Neb. 16. (8) Even in those states

where a married woman cannot be a partner, the partnership will be good between the others. *Plumer v. Lord*, 7 Allen, 481; 2 Bishop on Married Women, sec. 435. (9) The interest in Quigley & Co. represented by the separate property of Mrs. Quigley belongs to her, and cannot be taken for her husband's debts. *Holthaus v. Hornbostle*, 60 Mo. 443; Wells' Separate Prop. Married Women, sec. 68; Wait on Fraudulent Conveyances [2 Ed.], secs. 303–50*a*; *Hooton v. Ranson*, 6 Mo. App. 19; *Bartlett v. Umfried*, 94 Mo. 530; *Bank v. Taylor*, 62 Mo. 338; *Broughton v. Brand*, 94 Mo. 169; *Maghee v. Baker*, 15 Ind. 254; 17 Am. and Eng. Encyclopedia Law, p. 924, and cases.

BLACK, P. J.—This is a suit in equity by a large number of persons who are the judgment creditors of the defendant, John B. Quigley, the debts having accrued in 1882, at which time the said defendant became, and ever since has been, insolvent. The petition sets out the above facts in detail, and shows that executions have been issued on the judgments and returned *nulla bona*.

It is then alleged that the defendant, John B. Quigley, to prevent the collection of the above mentioned debts, entered into a nominal copartnership with his wife, Ava A., and his father, William B. Quigley; that Ava A. put no money into the firm and that William B. put very little money into it, all of which has been paid back to him by John; that the firm was nominally published to the world to enable John to carry on business, and at the same time avoid the payment of the debts due to plaintiffs; that John transacted the business without let or hindrance from his wife and father the same as he before conducted his own business; that there was no other change in the business than a transfer of the legal title to his property

for the purpose of avoiding payment of his debts; that the business became profitable; that large sums of money, bonds and stocks, received as profits, have been fraudently turned over to Ava A. and William B. Quigley, in trust for John; and that they so hold one thousand shares of the capital stock of the Sedalia Waterworks Company, and also eight hundred shares of the stock of the Arkansas City Waterworks Company.

Plaintiffs pray for the appointment of a receiver, that the defendants, the Quigleys, be ordered to bring all such property into court, that the property be sold, and for personal judgment against Ava A. and William B. Quigley. The answer is a general denial.

The following is an outline of the organization and transactions of the firm of Quigley & Company. In September, 1884, the defendant, William B. Quigley, sold and transferred in writting to Ava A., the wife of defendant, John B. Quigley, two steam shovels, a large number of scrapers, plows, dump cars, and other contractor's tools and outfits, to be held and owned by her as her sole and separate property free from the control of her husband. The bill of sale recites a consideration of $3,500 which was paid by her note secured by a mortgage on the property. The property thus transferred to her was worth not less than $15,000.

In October of the same year, 1884, William B., John B. and Ava. A. Quigley entered into articles of copartnership, under the style of Quigley & Co., for doing a general contracting business. Ava A. agreed to furnish all the necessary tools, machinery and appliances, and was to have fifty per cent. of the net earnings and profits and bear a like share of the losses. William B. agreed to furnish the money required, and was to have a general control of the business affairs and receive forty per cent. of the profits and bear a like portion of the losses. John B. Quigley was to have the manage-

ment of the business, and to receive a salary of $150 per month and ten per cent. of the net profits and bear a like proportion of the losses. Pursuant to this agreement Ava A. turned over to the firm the machinery and implements which she acquired by the bill of sale before mentioned, and William B. Quigley put into the firm the sum of $7,500 cash.

With this stock and money the firm executed two jobs of earthwork, making a profit of some $12,000. With the money thus earned and arising from the sale of some of the personal property contributed by Ava A., the firm acquired one-half of the stock of a corporation organized under the laws of the state of Illinois, known as the Interstate Gas Company. It seems a Mr. Plate owned the other half of the stock. The company built a number of gas works and waterworks at towns in this state and in the state of Kansas. The general plan seems to have been about this: The stockholders of the Interstate Gas Company would organize a local corporation which issued bonds and paid up stock, and with these bonds and stock the Interstate Gas Company built the works.

John B. Quigley was the engineer of the Interstate Gas Company, though he received pay for his services from Quigley & Company alone, that is to say, $150 per month as per partnership contract. In 1886 there was a change in the partnership agreement in this: John B. Quigly was to thereafter have a salary of $200 per month, and William B. Quigley was to have fifty instead of forty per cent. of the profits. This change was made because $150 per month was not sufficient to enable John to support himself and family. Another reason for the change was that at this date, July 1886, William B. Quigley put into the firm the further sum of $13,000, and demanded an additional interest in the

profits.   The $13,000 were used in paying assessments
on the stock in the Interstate Gas Company.

Later, in 1886, there was a trade between Plate
and the Quigleys by which Plate got the stock in the
Interstate Gas Company, and other stocks and bonds,
and the Quigleys got other stocks and some bonds of
the local companies.

In March, 1887, Quigley & Company, through
J. B. Quigley, purchased the waterworks plant owned
and operated by the city of Sedalia for $100,000, and
at the same time agreed with the city to reconstruct
and enlarge the plant pursuant to the terms of an ordi-
nance.   Thereupon Plate converted the Interstate Gas
Company into a corporation organized under the laws
of this state by the name of the Interstate Gas and
Waterworks Company.   This last named company
made a contract with Quigley & Company, whereby it
agreed to pay the city of Sedalia the $100,000 and
reconstruct those works, for which it was to have
$200,000 of first mortgage bonds and a one-half inter-
est in those works, Quigley & Company retaining the
other half subject to the mortgage.   To carry out this
scheme, a corporation was organized under the name
of the Sedalia Waterworks Company with a capital
stock of $200,000.   Paid up stock was issued to that
amount, the Quigleys getting one-half and Plate the
other half.   As a result of all these transactions
Quigley & Company became possessed of the stocks
mentioned in the petition, which are of a speculative,
rather than real, value.   As we view this case it is not
important to set out in detail the other facts disclosed
by the lengthy record before us.

This is not a proceeding to adjust the affairs of the
partnership of Quigley & Company, and to subject the
interest, if any, which John B. Quigley may have
therein, to the payment of the judgments held by the

plaintiffs. The petition proceeds upon the theory of fact that there was no real partnership, that it was but a fraudulent affair, devised for the purpose of enabling John B. Quigley to conduct a business of his own and at the same time avoid the payment of his debts, that the gains made were, in fact, the property of John and were turned over to Ava A. and William B. in fraud of the creditors of John.

We think the plaintiffs have failed to make out, by their proof, any such a case as that stated in their petition. It is true William B. Quigley testified to the following effect: The bill of sale to Ava A. Quigley was more of a gift, except as to the $3,500, to enable her to make a living, for they had nothing and were broken up. "John was my son, and I wanted to put things in her hands so they could make something. I went into the firm just because they had nothing, and I interested myself to get them started. I was not willing to pay John's debts."

It is shown beyond a shadow of doubt that William B. Quigley owned the steam shovels and other property transferred to Ava A. Quigley, and that John had no interest whatever in them. William B. Quigley, therefore, had a perfect right to settle this property upon her as her sole and separate property, for he was under no obligation to pay his son's debts. She held this property free from the claims of her husband's creditors. The proof is clear that she put this property into the firm in 1884, and at the same time William B. Quigley put into the firm $7,500 in cash. In 1886 William B. Quigley made a mortgage on his farm and thereby raised $20,000, $13,000 of which went into the firm to pay assessments upon the stock in the Interstate Gas Company. In short, the whole capital of the firm was raised by Ava A. and William B. Quigley, and it is clearly shown that John never

had $1 in the firm. For two or three years William B. Quigley superintended the business of the firm and was often at the places where the work was being prosecuted. He was a man advanced in years, and in poor health, so that after that time he left the affairs of the firm to the management of his son, and it was during this time that the son drew out $8,000 or $10,000.

The firm was created for an honest purpose, and transacted business on the property and money furnished by Ava A. and William B. Quigley. The evidence does not show that it was formed as a cover to enable John to defraud his creditors. Furthermore, it is perfectly plain that John has no interest whatever in the property held and owned by the firm at the time this suit was commenced. He was, in fact, indebted to the firm. The foregoing is sufficient to show the infirmity of plaintiff's case. The judgment is affirmed. BARCLAY, J., absent. The other judges concur.